Jeffrey B. TENPAS and Barbara Tenpas,
Plaintiffs-Respondents-Petitioners,

v.

DEPARTMENT OF NATURAL RESOURCES,
Defendant-Appellant.

Supreme Court

*No. 86-1430. Argued January 3, 1989.—Filed March 1, 1989.*

(Also reported in 436 N.W.2d 297.)

■■■■■■■■

■■■■■■■■

■■

For the plaintiffs-respondents-petitioners there was a brief by *Byron C. Crowns* and *Crowns, Midthun, Metcalf & Quinn, S.C.,* Wisconsin Rapids, and oral argument by *Byron C. Crowns.*

For the defendant-appellant the cause was argued by *Maryann Sumi,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

HEFFERNAN, CHIEF JUSTICE. This is an appeal from a decision of the court of appeals which reversed the circuit court for Adams county, Raymond Gieringer, judge. We reverse the decision of the court of appeals. This case presents the question of whether cranberry dams in this state are subject to the financial responsibility requirements of sec. 710.11, Stats., and related portions of chapter 31 of the state statutes.

Plaintiffs Jeffrey and Barbara Tenpas are cranberry growers who in July of 1983 bought a cranberry marsh in Adams county. Their land is crossed by Bingham Creek, a navigable stream, and includes two dams across the creek. The dams were built in 1938 for the purpose of cranberry cultivation and have since been used continuously as cranberry dams.

On June 14, 1984, the Wisconsin Department of Natural Resources (DNR) wrote the Tenpases (hereinafter Tenpas) stating that the land they had bought was not properly transferred because Tenpas had no permit for the transfer of the dams as required under sec. 710.11, Stats.[1] The DNR letter suggested that noncom-

---

[1] Section 710.11, Stats., provides:

pliance with the dam transfer statute clouded the Tenpas title to the land and would make mortgaging difficult.

Under protest, Tenpas applied for and obtained a DNR dam transfer permit. The issued permit identifies the two dams involved as earthen dikes that have concrete water control structures approximately eight feet wide and eight feet tall.

The dam transfer permit issued by the DNR contained several significant conditions which Tenpas was required to accept to receive the permit. First, Tenpas was ordered to complete certain specified repairs to the dams.[2] Tenpas was also ordered to file a $2,500 letter of credit for ten years, the credit amount to be reduced to $1,000 after the specified repairs were completed. Tenpas was ordered to waive any objection to unlimited DNR inspection of the dam. And finally, the DNR permit established a maximum level for the water behind the upper dam. The permit also reserves for the DNR the right to establish by subsequent order a minimum flow of water from the lower dam.

While the permit application was pending, Tenpas began this action asking the circuit court to declare that cranberry growers are not subject to sec. 710.11, Stats. Judge Gieringer decided the matter on summary judgment, finding that DNR regulation of cranberry dams under sec. 710.11 would impermissibly conflict with

---

**Transfer of land where dam exists.** A person may not accept transfer of the ownership of a specific piece of land on which a dam is physically located unless the person complies with s. 31.14(4).

[2]Finding No. 6 of the permit issued to the Tenpases specifies repair of cracks in the concrete wingwalls and spillways of each dam; replacement of missing concrete in an emergency spillway; and removing woody vegetation from the dikes. Order No. 7 of the permit makes performance of these repairs a condition of acceptance.

rights granted to growers by the cranberry laws, secs. 94.26 to 94.30, Stats., passed in 1867. Tenpas was granted summary judgment declaring his right to be free of the requirements of sec. 710.11. The DNR appealed.

The court of appeals reversed the judgment, finding that the dam transfer permit requirement of sec. 710.11, Stats., applies to all dams in the state, including cranberry dams; and that the dam transfer permit requirement does not conflict with the scheme set up by the legislature under the cranberry laws. Judge Sundby, dissenting, stated that chapter 31 dam transfer regulations do not apply to cranberry growers. He concluded that the power of cranberry growers to use water and dams for cranberry cultivation has been independently regulated for 120 years by the cranberry laws, without interference by the DNR or its predecessors. Sundby urged that if a legislative act seeks to impose DNR regulation under chapter 31 on the cranberry industry, it must be more advertent than sec. 710.11.

This case involves application of statutes to undisputed facts. It therefore presents a question of law, a question to be reviewed by this court *de novo,* without deference to the decisions of the courts below. *City of Waukesha v. Salbashian,* 128 Wis. 2d 334, 347, 382 N.W.2d 52 (1986).

The parties agree that cranberry dam owners were granted certain rights by the legislature in 1867. Presently codified in sec. 94.26 et seq., Stats., the essential grant of the cranberry laws provides:[3]

---

[3]Section 94.26, Stats., reads in full:

**Cranberry culture; maintenance of dams, etc.** Any person owning lands adapted to the culture of cranberries may build and

> Any person owning lands adapted to the culture of cranberries may build and maintain on any land owned by him such dams upon any watercourse or ditch as shall be necessary ....

The cranberry laws also impose liability for, and provide a procedure for recovering, damages that are caused by cranberry dams. Sections 94.27 to 94.30, Stats., provide a comprehensive scheme for the erection and maintenance of cranberry dams and detailed procedures for arbitration and recovery of damages if injury is occasioned by the failure of a dam. They appear to provide strict liability subject to implementation under special procedures.

The DNR urges that the rights granted by the cranberry laws only narrowly limit their general power to regulate dams under chapter 31 of the statutes. The DNR argues that their regulatory power is displaced by the cranberry laws only with regard to whether, where and for what purpose a cranberry cultivator seeks to build a dam. Tenpas argues, on the other hand, that as cranberry growers the specificity of the cranberry laws exempt them from general DNR regulation of dams under chapters 30 and 31.

The DNR has also urged, and the court of appeals majority generally agreed, that this case should focus on sec. 710.11, Stats. The DNR argues that sec. 710.11

maintain on any land owned by him such dams upon any watercourse or ditch as shall be necessary for the purpose of flowing such lands, and construct and keep open upon, across and through any lands such drains and ditches as shall be necessary for the purpose of bringing and flooding or draining and carrying off the water from such cranberry growing lands, or for the purpose of irrigation, fertilization and drainage of any other lands owned by such person; provided, that no such dams or ditches shall injure any other dams or ditches theretofore lawfully constructed and maintained for a like purpose by any other person.

establishes regulation of financial responsibility for all dams. Recently enacted,[4] it contains no express exception or cross-reference to the cranberry laws. Even if it conflicts with rights granted under the cranberry laws, the DNR urges us to hold that sec. 710.11 supersedes earlier, contrary law.

We conclude, however, that sec. 710.11, Stats., is not amenable to strictly independent interpretation. On its face, sec. 710.11 itself does not define a new or separate wrong. Section 710.11 provides,

> [a] person may not accept the transfer of the ownership of a specific piece of land on which a dam is physically located unless the person complies with s. 31.14(4).

The statute merely gives notice of a consequence of failure to comply with sec. 31.14(4), Stats. The legislative note accompanying sec. 710.11 states that the purpose of the provision is to:[5]

> ... ensure that people working in the real estate profession, including brokers, attorneys and mortgage insurance companies, will be aware of the

---

[4]Section 710.11, Stats., was introduced to the legislature at the request of the DNR by the Law Revision Committee. It was enacted by Chapter 246 of the Laws of 1981, effective April 27, 1981.

[5]The legislative note to sec. 710.11, Stats., reads in full:

The creation of section 710.11 of the statutes should ensure that people working in the real estate profession, including brokers, attorneys and mortgage insurance companies, will be aware of the requirements of sections 31.14(4) and 31.185(1) and (2) of the statutes. This new awareness should enable the department of natural resources to maintain accurate records regarding dam ownership and improve the administration of its dam safety program.

requirements of sections 31.14(4) and 31.185(1) and
(2) ....

At oral argument, counsel for the DNR agreed that sec.
710.11, Stats., is no more than a provision giving notice
of some of the requirements of ch. 31. We therefore
consider the relevant portions of chapter 31 of the
statutes.

Chapter 31 of the statutes is entitled, "Regulation
of Dams and Bridges Affecting Navigable Waters."
Together with chapter 30 ("Navigable Water, Harbors
and Navigation"), it provides a comprehensive scheme
for the regulation of Wisconsin's waters, dams and
bridges through the use of permits issued by the DNR.
The DNR has broad regulatory power under these
chapters. For example, sec. 31.02, Stats., empowers the
DNR to regulate the level and flow of all navigable
water and to determine methods of construction, opera-
tion and maintenance of any dam. The legislative
commitment to comprehensive administrative regula-
tion of Wisconsin's water use law under chapters 30
and 31 is longstanding, beginning with the water power
acts of 1911, 1913 and 1915. A. Kanneberg, *Wisconsin
Law of Waters,* 1946 Wis. L. Rev. 345, 360.

The specific portion of chapter 31 under which the
DNR claims to act in this case is sec. 31.14(4), Stats.
Section 31.14 regulates dam maintenance by requiring
special permits for dam building, improvement or
transfer. Section 31.14(2) provides that all dams built
or enlarged will be issued permits only after the
"applicant furnishes to the department proof of ability
to operate and maintain the dam in good condition."
Subsection (4) imposes the same financial responsibili-

ty requirement whenever the ownership of a dam is transferred.[6]

---

[6]Section 31.14, Stats. (1985-1986) provides in full:

**31.14 Proof of ability to maintain dams required. (1)** It is the policy of this section to preserve public rights in navigable waters, including those created by dams, and to provide a means of maintaining dams and the developments which have been made adjacent to the flowage of such dams.

(2) Except as provided in sub. (3), a permit shall not be granted under s. 31.06, 31.08 or 31.13:

(a) Unless the applicant furnishes to the department proof of ability to operate and maintain the dam in good condition, either by the creation of a special assessment district under ss. 31.38 and 66.60, or by any other means which in the department's judgment will give reasonable assurance that the dam will be maintained for a reasonable period of time not less than 10 years; or

(b) If a majority of the municipalities in which 51% or more of the dam or flowage is or will be located files with the department, prior to the granting of the permit, their objections to the granting of such permit in the form of resolutions duly adopted by the governing bodies of such municipalities.

(3) Subsection (2) does not apply if the applicant complies with each of the following requirements:

(a) Furnishes proof satisfactory to the department that he owns or has an enforceable option to purchase all the land which is or will be flowed by the impoundment, together with the shore line and an immediately adjacent strip of land at least 60 feet in width, but the department may in a particular case permit a narrower strip where the 60-foot minimum is impractical and may, in furtherance of the policy stated in sub. (1), require ownership of a wider strip.

(b) Files with the department a writing in such form as the department requires in which he agrees that following the initial filling of the proposed pond he will not convey the dam to another without first obtaining department approval. The department may require from an applicant who does not have the power of eminent domain a bond or other reasonable assurances that he will adhere to such agreement.

(c) Furnishes proof satisfactory to the department that he has dedicated or will dedicate a parcel of land for public access to the impounded waters.

To determine whether sec. 31.14(4), Stats., applies to cranberry dams, we look to the language of the statute itself. *Ball v. District No. 4 Area Board,* 117 Wis. 2d 529, 539, 345 N.W.2d 389 (1984). Operation of sec. 31.14(4) is triggered by the transfer of the ownership of "a dam." And although we construe sec. 31.14 as a comprehensive statute, the term "dam" is not specifically limited or defined in that section, or elsewhere in the chapter. We might presume that the unqualified term "dam" makes this section applicable to every dam in the state, including cranberry dams.

■

We do not adopt the construction of sec. 31.14(4), Stats., advocated by the DNR because, as we explain more fully below, it would conflict with rights granted growers under the cranberry laws. We will construe statutes, where it is reasonable, so as to avoid conflict with other statutes. *State ex rel. McManman v. Thomas,* 150 Wis. 190, 196, 136 N.W. 623 (1912). Consequently, we find the most reasonable construc-

---

(4) No person may assume ownership of a dam after October 21, 1961, or the ownership of that specific piece of land on which a dam is physically located after April 27, 1982, without first complying with sub. (2) or (3). The transfer of the ownership of a dam or the ownership of a specific piece of land on which a dam is physically located made without complying with sub. (2) or (3) is void unless a permit to abandon the dam was granted under s. 31.185 or unless the transfer occurred by operation of law. Every person who accepts ownership by operation of law is subject to this chapter.

(5) For the purpose of implementing the policy stated in sub. (1), the department may by rule require all or specified classes of persons operating a dam for profit to create a fund or reserve to be used for major repairs, reconstruction or removal of the dam when necessary. Such rules shall prescribe the manner in which such fund or reserve is to be created, maintained and expended. This subsection shall not apply to a person who has the power of eminent domain.

tion of sec. 31.14(4) provides the DNR with regulatory power over dams generally, with the exception of cranberry dams.

The provisions of secs. 31.14, Stats., seem designed to accommodate the regulation of large power dams. Section 31.14(2) speaks of proving financial responsibility for maintenance by establishing special assessment districts. The statute also allows non-municipal dam owners to prove financial responsibility by posting bond. Section 31.14(5) provides also that the DNR may require creation of a fund for major repairs or removal of the dam when necessary, but does not apply to dam owners who have the power of eminent domain.

The legislative history of sec. 31.14, Stats., suggests that it is intended to regulate power dams, rather than cranberry dams. Section 31.14 was drafted by the Water Resources Committee of the Wisconsin Legislative Council and was enacted into law by 1961 Laws of Wisconsin Chapter 568. Both the minutes of the Committee and the 1959 Joint Resolution of the legislature that prompted the Committee are concerned primarily with the problem of abandonment of large dams by power companies. See *Wisconsin Legislative Council Staff Report* 61-2, available in *Wisconsin Legislative Council and Council Committees,* 1959–61 (Legislative Reference Bureau). No mention was made of cranberry dams despite preexisting cranberry dam regulation.

We are aided in the construction of this statute by the history of application of this body of law. Administrative interpretation by the DNR is one avenue of inquiry. *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434 (1978). Tenpas submits that the DNR has heretofore not required cranberry growers to submit to regulation under chapter 31 of the statutes. If

the DNR believed they had power to regulate cranberry growers under chapter 31, they have presented no evidence of a prior administrative construction to that effect.

Nine years ago in *State v. Zawistowski,* 95 Wis. 2d 250, 290 N.W.2d 303 (1980), this court considered whether DNR water-use permits under sec. 30.18, Stats., are required of cranberry growers. Section 30.18 requires persons who divert water from streams or lakes to obtain a DNR permit. Despite its sweeping and unambiguous language, the court found this permit requirement to conflict with the right to build and maintain dams and ditches granted by the cranberry laws: cranberry dams and ditches are useless if they may not be filled with water. Relying on the rule that the more specific statute prevails, *Zawistowski* held that cranberry dams are more specifically regulated by the cranberry laws than by the generalized DNR water use regulations of chapter 30.

Although *Zawistowski* found conflict on general grounds between the cranberry laws and the DNR water-use permit requirement, the DNR urges that the permit requirement in this case would not conflict with rights granted to growers under the cranberry laws. Assurances of financial responsibility, the DNR argues, do not interfere with cranberry growers right to "build and maintain" dams under the cranberry laws. After styling the permit in this case as a limited and modest requirement, the DNR asks that we affirm their permit power on the grounds that it does not conflict with rights granted by the cranberry laws.

We find a conflict. The power to grant or withhold a permit is the power to regulate. Section 31.14, Stats., requires dam owners to supply proof to the DNR that they are financially able to maintain dams as specified

by the DNR. For non-municipal dam owners, like Tenpas, this reduces to filing a bond in an amount the DNR determines to be sufficient to pay for whatever maintenance it requires. The bond is not imposed as security for damages that might arise from a failure of a dam, but is a means of ensuring that the DNR order of maintenance will be accomplished. However, the power to control cranberry dam maintenance has already been granted to the owners of those dams in sec. 94.26, Stats. The DNR cannot also control the maintenance of those dams without diminishing the previously conferred rights of cranberry dam owners.

Further conflict between sec. 31.14(4), Stats., and the cranberry laws becomes apparent from the integrated nature of chapter 31. Section 31.14 is internally integrated and is primarily linked with other parts of chapter 31. Section 31.14(4) operates by requiring compliance with secs, 31.14(2) or (3). These sections, in turn, regulate permits issued under secs. 31.06, 31.08 or 31.13, Stats., for the construction, maintenance or enlargement of dams. Section 31.185, Stats., is also closely related to sec. 31.14 and requires a permit for alteration or removal of a dam. The integrated nature of dam regulation under chapter 31 suggests the term "dam" used in subsection 31.14(4) be construed *in pari materia* with its use in other parts of the chapter, thus yielding a consistent whole. *State v. ILHR Dept.*, 101 Wis. 2d 396, 403, 304 N.W.2d 758 (1981). The DNR urges that in this case we need not reach the question of the conflict between the cranberry laws and these other provisions of chapter 31. But we see no reason to assume under the basic rationale urged by the DNR that the related sections of chapter 31 will be applied differently. Chapter 31 imposes a panoply of dam

regulations which would all apply as logically as sec. 31.14(4) to cranberry dams.

Any doubt that lingers about whether the sec. 31.14(4), Stats., dam permit requirement conflicts with rights granted under the cranberry laws can be satisfied by examining the permit issued to the plaintiffs in this case. The permit specifies how Tenpas' cranberry dams are to be operated and maintained, expressly ordering a number of repairs to be made as a condition of the permit. The permit also claims power under sec. 31.02, Stats. Counsel for the DNR at oral argument frankly admitted that they do not believe their regulatory power over cranberry growers stops with sec. 31.14(4). This evidence fortifies our conclusion based on the reasoning above that sec. 31.14(4) conflicts with the cranberry laws.

Consistent with our decision in *Zawistowski,* we are persuaded that where general DNR dam regulations collide with rights granted by the cranberry laws, the more specific provisions of the cranberry laws apply.

The DNR has also argued that the state's paramount interest in protecting public safety supersedes any rights that cranberry growers were granted under the cranberry laws. They argue on the strength of *Cranberry Creek Drainage District v. Elm Lake Cranberry Company,* 170 Wis. 362, 174 N.W. 554 (1920) and *Chippewa & Flambeau Imp. Co. v. Railroad Comm.,* 164 Wis. 105, 159 N.W. 739 (1916), that the cranberry laws were long ago superseded by administrative regulation of dams. We find no evidence to support this contention. Certainly this court's decision in *Zawistowski* stands for a contrary proposition. The fact that the legislature updated the accountability procedure of the cranberry laws under ch. 317, Laws of 1981, confirms

the continuing vitality of the cranberry laws as statutes that are to be independently construed.

We do not address the power to impose the strictures of chapters 30 and 31 on cranberry enterprises for it is clear that the legislature has not made that intent evident. Although public safety is a concern of the state, the DNR presents no authority suggesting that the legislature has delegated to the DNR the power to regulate safety hazards created by cranberry dams. In addition to liability arising under the cranberry laws themselves, cranberry dams are still subject to common law tort and property use restrictions. The public is not unprotected.

We hold that the specific legislative treatment of cranberry growers under sec. 94.26, Stats., precludes application of the general financial responsibility requirements of secs. 710.11 and 31.14(4), Stats., to cranberry dams. Because we conclude that secs. 710.11 and 31.14 do not apply to cranberry dams, we reverse the decision of the court of appeals and reinstate the declaratory judgment of the trial court.

*By the Court.*—Decision reversed.