† Petition to review granted. *Page 560 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 561 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 562 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 563 
Karen K. Gertsch and her brother, Peter J. Van Altena (collectively, the heirs) appeal from an order entered upon an amended petition for instructions. The petition was filed by the personal representative, First Wisconsin Trust Company (First Wisconsin), requesting the court to determine whether it should honor the heirs' assignments of 40% of their distributive shares in Katze-Miller's estate to International Equity Research Corporation (IER), an heir search enterprise.[1] *Page 564 
We conclude that the trial court correctly determined the assignments were valid, and, accordingly, we affirm.
The facts dispositive of this controversy are undisputed. Katze-Miller died testate at age 83 on June 23, 1986. Her will, executed on March 21, 1985, bequeathed personal property and one-half of her residual estate to a sister-in-law and "One-half (1/2) thereof to my heirs at law then living."
First Wisconsin, as nominated personal representative, filed its petition for probate on June 26, 1986. It indicated that the decedent's heirs at law were Peter and Karen Van Altena, the decedent's nephew and niece. The petition further averred: "WHEREABOUTS OF BOTH BENEFICIARIES IS UNKNOWN AND HAS NOT BEEN KNOWN SINCE 10/28/35; IF NOT LOCATED, THERE ARE OTHER UNKNOWN HEIRS. POSSIBLE ESCHEAT PER WIS. STAT. SEC. 852.01(3)." The Wisconsin Secretary of State was also named as an interested party.
Also on June 26, 1986, based on the petition, the court appointed Attorney Charles B. Randall as the guardian ad litem for the unknown heirs. The order of appointment likewise recited the fact that the whereabouts of Peter and Karen were unknown.[2]
Paul Noot first found out about Katze-Miller's estate from publication of the petition in the Daily Reporter commencing July 1, 1986. Paul received a summary of the publication from his other son, Richard. On July 26, 1986, Paul forwarded to Ruth Rasch, a researcher for IER,[3] a list of estates to examine, *Page 565 
including the Katze-Miller estate. Rasch abstracted information the Katze-Miller estate. Rasch abstracted information from the petition for probate, the order appointing the guardian ad litem, and the file in the Milwaukee County Probate Court, and forwarded it to Paul Noot on August 14. Paul then directed Rasch to proceed with the investigation. She found guardianship files for Peter and Karen, ascertained their dates of birth, obtained birth records, found Karen's marriage certificate (changing her name from Van Altena to Gertsch), and then located Karen in the Milwaukee telephone book at the residence of Eugene Gertsch. She relayed this information to Alan Noot. Alan called Eugene Gertsch, ascertained that Karen was an heir, and also obtained Peter's address. On August 23, Paul forwarded identical letters[4] to Peter and *Page 566 
Karen; and assignments[5] of partial interest. These *Page 567 
documents identified IER, informed Peter and Karen that they may be heirs or owners of interests, and solicited assignments of a 40% contingent fee in the interests. *Page 568 
Karen discussed the documents with her husband Eugene, a retired banker. Eugene contacted an attorney who had drafted wills for the family. The attorney advised Karen and Eugene to review the escheat lists and consider whether they had any relatives who might have left inheritances. However, Karen could not think of any relatives that had recently died. She did not investigate further, nor did she call the attorney back as he had requested. Eugene also called a former colleague, ironically an officer of First Wisconsin and its general counsel. The officer characterized IER's solicitation as "strange," suggested that the percentage was too high, but opined that a few dollars was better than nothing. Conjecturing that the amount involved a dormant bank account of nominal amount, Karen executed the assignment on or before August 29, 1986.
Peter discarded his first IER letter and assignment. Some time later Paul informed him that Karen had returned her signed assignment. Peter then requested another assignment. He considered consulting a lawyer, but ultimately decided not to. On September 23, 1986, Peter executed and returned the assignment.
On September 30, 1986, Paul wrote to Karen and Peter, informing them that their aunt, Virginia Katze-Miller, had died, leaving one-half of her residual estate to her heirs-at-law then living. IER also informed them that the estimated valuation of the estate was "in excess of $25,000," and that a complete inventory would be filed later.
With its September 30 letter, IER also enclosed "Attorney Letters of Authorization" which authorized C. James Riester, a Milwaukee attorney, to represent *Page 569 
both Karen and Peter in the probate proceedings. The letters of authorization stated that Riester represented IER's interest as assignee in Virginia's estate, and that Riester would represent Karen and Peter "for the purpose of establishing [their] right to inherit. . . and in obtaining distribution of the assets for the joint benefit of International Equity Research" and the heirs. Peter signed the attorney authorization on October 7; Karen signed hers on October 9, 1986. Later that month, Riester formally acknowledged receipt of the heirs' retainers, forwarded them to IER, and entered his appearance in the estate on behalf of Peter and Karen.
On March 3, 1987, the personal representative mailed copies of the estate inventory to Riester and the heirs.[6] On March 16, IER mailed a genealogical family chart, a document list, and copies of records to Riester, who forwarded copies to the personal representative and the guardian ad litem. On March 19, IER mailed copies of the chart and other documentation to the heirs.
During the time IER conducted its search and gathered information, guardian ad litem Randall conducted his own heir search to ascertain the existence of the heirs. Randall's efforts by happenstance turned up Karen's social security number.
On August 12, 1986, Randall forwarded a letter to Karen through the Social Security "letter-forwarding" service, which informed Karen of her interest in the estate. The Milwaukee Social Security office received Randall's letter two days later. On August 28, it forwarded the letter to the Baltimore office. On November 9, 1986, Social Security belatedly delivered Randall's letter *Page 570 
to Karen. She wrote to Randall on November 24 to ask how it was possible that IER was able to contact her before the guardian ad litem did. Randall did not reply to her letter because he felt it would be improper for him to contact her after Riester had appeared as her attorney.
Karen made further inquiries and eventually learned of the exact size of the estate in January, 1987. Karen and Peter then discharged Riester and engaged their own counsel.
After receiving Peter's discharge letter, Riester appeared on behalf of IER for the first time on March 19, 1987, and on March 27, presented IER's assignment to the personal representative. His original Notice of Appearance in October had indicated he represented Karen and Peter only. On July 2, 1987, the personal representative filed its petition for instructions, asking the probate court to determine whether distribution should be made pursuant to the assignment. It is from that memorandum decision and order that Peter and Karen appeal.
The heirs argue that: (1) the assignment is champertous and otherwise void as contrary to public policy; (2) it was not supported by adequate consideration; (3) it was obtained by misrepresentation; and (4) it is unconscionable.[7] They argue in the alternative that the trial court should have drastically reduced the amount of the assignment consistent with the testimony of IER's own witness.[8] IER cross-appeals a determination which denied its motion for double costs and 12% interest pursuant *Page 571 
to sec. 807.01, Stats. We reject the heirs' arguments and affirm the order instructing the personal representative to honor the heirs' assignment to IER. We also affirm the denial of double costs and 12% interest to IER.
PROFESSIONAL MISCONDUCT
The heirs argue that Riester's conduct violated the Supreme Court Rules (SCR) of professional conduct for attorneys and rendered the assignment contrary to public policy. They contend that Riester's failure to explain the advantages and risks of common representation violatedSCR 20:1.7, and that failure to consult them concerning his contingent interest in the litigation and obtain their consent to payment of fees by IER violatedSCR 20:1.8(f)(1). The heirs also complain that Riester failed to keep them informed about the estate's status.SCR 20:1.4. However, upon First Wisconsin's petition for instructions, the heirs presented a Statement of Issues to the trial court. Their statement did not raise these issues and the trial court did not consider them or make any determination regarding Riester's conduct. This argument was therefore waived and we decline to consider it. See Zeller v. Northrup King Co.,125 Wis.2d 31, 35, 370 N.W.2d 809, 812 (Ct.App. 1985).
CHAMPERTY
The heirs contend that the assignment is champertous and hence unenforceable because it offers to undertake an heirship search and investigation, including attorney services, in exchange for a 40% interest in their distributive shares. The heirs also claim the assignment is unenforceable because it is violative of public policy. *Page 572 
Champerty was defined by the Wisconsin Supreme Court in Gelo v. Pfister Vogel Leather Company,132 Wis. 575, 579, 113 N.W. 69, 70 (1907), as "`the unlawful maintenance of a suit, in consideration of some bargain to have part of the thing in dispute, or some profit out of it.'" The court also defined maintenance as "`an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it.'" Id. From these limited definitions and sparce Wisconsin case law, we examine whether the assignment is champertous.
The parties agree, and we concur, that enforcement of assignments of shares in an estate lies within the discretion of the trial court. See Estate of Wettig,29 Wis.2d 239, 244, 138 N.W.2d 206, 209 (1965). When inferences conflict or if more than one inference may be drawn from the facts, we are bound by the trial court's selection. C.R. v. American Standard Ins. Co.,113 Wis.2d 12, 15, 334 N.W.2d 121, 123 (Ct.App. 1983). We conclude that the trial judge examined all relevant facts and correctly concluded that the assignment was not champertous.
The trial court rejected the heirs' argument that IER interjected itself into the probate proceeding. It correctly noted that no statute imposes any, much less an exclusive, heir-tracing duty upon a guardian ad litem.[9] In addition, there is nothing in sec. 879.23(1) to suggest that a guardian ad litem has a duty to identify and locate missing heirs. In fact, the attorney for First Wisconsin expressed an intent to use an heir-finder if Randall's efforts failed. IER promoted no litigation when it undertook *Page 573 
an investigation as to the whereabouts of Karen and Peter. It was a fact-finding expedition rather than a litigious exercise.
In addition, at the time of the assignment, IER owed no duty of disclosure to the heirs. As the trial court noted, IER could have remained silent. The assignment neither undertook litigation or promoted pending litigation. The petition for probate and related documents on file were public records which the heirs, anyone on their behalf, or any member of the public could have inspected and investigated. The trial court relied on Sparne v.Altshuler, 90 A.2d 919 (R.I. 1952), which involved an heir who assigned a part of her inheritance in return for information which would substantiate her heirship. The Rhode Island Supreme Court rejected the heir's champerty and public policy arguments and upheld the. assignment absent fraud or unconscionable conduct.[10] As noted by the trial court, Sparne relied on Miller v.Anderson, 183 Wis. 163, 196 N.W. 869 (1924), which involved an assignment contract between a creditor and an informant to pay the informant a percentage of a potential recovery of an account payable from a debtor of which the creditor was unaware. The Wisconsin Supreme Court in Miller determined that this agreement did not promote litigation. It only gave the client true information about his account. Id. at 171, 196 N.W. at 872. Therefore, it was not champertous and did not violate public policy. Public policy commands that the courts enforce contracts voluntarily entered between *Page 574 
competent adult parties. Merten v. Nathan,108 Wis.2d 205, 212 n. 5, 321 N.W.2d 173, 177 n. 5 (1982).
The heirs contend that their letter of retainer to Riester made the assignment champertous. The trial court found that IER explained the nature of Riester's representation to the heirs and that his dual representation of IER and them presented no conflict of interest. His function was to present the facts of their heirship to the personal representative together with a copy of the assignment. Section 863.07, Stats. If the personal representative disputed the heirs' claim to heirship, e.g., by filing a proof which excluded them, then at that time the heirs would decide whether to contest the issue. The assignment authorizes IER to take steps to recover the heirs' share. Nothing in the assignment vests IER or Riester with a present right to litigate. Further, the heirs were free to discharge Riester as their attorney and, in fact, did so.
In this respect, it is noteworthy that before the heirs signed the letters of retainer, IER had informed them of the estate title, file number and identity of the court. They could readily have ascertained who the personal representative was, the identity of the guardian ad litem, and obtained from them an estimate of the size of the estate. The trial court could have concluded that reference to an attorney for IER in the assignment, in IER's cover letters and in the letters of retainer were not champertous because they did not relate to contemplated litigation.
The probate process itself proves that heirship was never in a posture of litigation. Under Wisconsin probate practice the personal representative, here, First Wisconsin, *Page 575 
usually files the will and petitions for probate[11] and for heirship determination.[12] The personal representative may file written proof of heirship and upon a hearing, the court determines heirship. Its findings of fact are included in the final judgment.[13] Heirship determination, therefore, does not assume the spectre of a contest or litigation until an interested party, by way of counter-proof or motion, controverts the proof filed by the personal representative. Here, no heirship litigation ever pended in the trial court, none was contemplated, and the conclusiveness of the proof filed with the probate court makes it unlikely that any litigation will ever occur. The assignment neither instigated an action nor promoted a pending dispute. The probate proceeding was occasioned by Katze-Miller's death and admission of her will. The proceeding would have followed the same course through probate, irrespective of IER's involvement. IER's contribution to the proceeding moved the estate down the same path it was already on.
IER sold a service for a charge, payment of which was contingent upon ultimate recovery. As correctly noted by the trial court, Miller stated that the basic principles of champerty "involve a common element, namely, existing or contemplated litigation." Miller at 169, 196 N.W.2d at 871. Without a "suit" or "litigation," there can be no champerty. Design For Business Interiors,Inc. v. Herson's, Inc., 659 F. Supp. 1103, 1108
(D.D.C. 1986). We agree with the trial court's statement that "[t]here was nothing in dispute or litigation at the time the assignments were signed. There was a non-adversarial probate proceeding pending. There was nothing *Page 576 
that could justify the application of the law against champerty." Because it was not champertous and not violative of public policy, we will not upset the trial court's exercise of discretion.
ADEQUACY OF CONSIDERATION
Enforcement of the assignment is controlled by equitable principles including fair and adequate consideration.Estate of Wettig, 29 Wis.2d at 244,138 N.W.2d at 208. We conclude that adequacy of consideration presents a mixed question of fact and law. The trial court found that the assignment was supported by adequate consideration. This is a finding of fact. See Jax v. Jax,73 Wis.2d 572, 586, 243 N.W.2d 831, 839 (1976). Unless clearly erroneous, we affirm findings of fact. Section805.17(2), Stats.; Noll v. Dimiceli's, Inc.,115 Wis.2d 641, 643, 340 N.W.2d 575, 577 (Ct.App. 1983).
Credible evidence supports the trial court's finding of adequate consideration. The court referenced many of IER's efforts to locate the heirs. Before and after execution of the assignment, IER conducted an investigation into the heirs' antecedents. It took five months for IER to determine that the heirs' father sired no other children from a second marriage. IER contacted both Peter and Karen several months before the guardian ad litem. The personal representative used IER's documentation establishing the sole heirship of Karen and Peter. The court found that IER performed valuable services and concluded that the services supported the consideration. We are bound by the trial court's findings of fact and agree with its conclusion. *Page 577 
MISREPRESENTATION
Relying on Ollerman v. O'Rourke Company,94 Wis.2d 17, 288 N.W.2d 95 (1980),[14] the heirs seek rescission of the assignment because, they contend, it resulted from IER's intentional misrepresentation.[15] They complain that when IER first wrote to them, it did not reveal that an estate had been opened and that a guardian ad litem had been appointed for them. The heirs assert that IER had a duty of disclosure that arose by virtue of IER's peculiar knowledge of facts exclusively in its possession. The heirs argue that IER used its superior position to induce them to sign the "preposterous" assignment which assured IER a "huge windfall." The heirs contend that several statements in the letter were misleading. For example, the letter referred to a possible escheat of their. interest, although IER knew that even if the heirs' share escheated, they would have ten years to establish their claim. See sec. 863.39, Stats.
The first two elements of intentional misrepresentation are: (1) a statement of fact; (2) which is untrue.Ollerman, 94 Wis.2d at 26, 288 N.W.2d at 99. The nature of the words used and the reliance they may reasonably induce is the gist of the tort. The trial court found that IER made no misrepresentations. As stated above, we affirm the trial court's findings if they are supported by credible evidence. The trial court expressly found that the words "risk" and "expense" in the forwarding *Page 578 
letter referred to and adequately explained IER's contingent charge. IER had no information regarding any possible claims against or expenses chargeable to the gross estate; therefore, IER had no knowledge of what the amount available for distribution would ultimately be. IER's letter also referenced the efforts employed to locate the heirs and the difficulty of proving the heirs' entitlement, which could include the search and exclusion of other possible heirs. These facts support the trial court's finding.
UNCONSCIONABILITY
The heirs reason that IER's superior bargaining position arising from its knowledge makes the assignment unconscionable. They claim IER abused its temporary monopoly of the facts by misleading the heirs into assigning 40% of their shares in exchange for nothing. The trial court, however, found that IER's efforts conferred a substantial benefit on the heirs and the record supports this finding.
Unconscionability of a contract is determined as of the time the parties entered the agreement. Brobeck v.Telex Corp., 602 F.2d 866, 875 (9th Cir. 1979). At the time of the assignment, IER knew that a petition for probate and related documents had been filed. The petition recited that the value of the estate exceeded $25,000. IER did not know if other heirs existed, the extent of creditor's claims, if any, charges against the estate, or the amount of final distribution.
In Discount Fabric House of Racine, Inc. v. WisconsinTelephone Company, 117 Wis.2d 587, 600-02,345 N.W.2d 417, 424 (1984), the Wisconsin Supreme Court *Page 579 
agreed[16] that two inquiries determine unconscionability: (1) relative economic strength in terms of practical options; and (2) substantive reasonableness of the contract. Generally, unconscionability means the absence of a meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other. Id. The court adopted the factors of procedural and substantive unconscionability. Id. at. 602,345 N.W.2d at 424-25. Procedural unconscionability relates to factors bearing on the meeting of the minds; substantive unconscionability pertains to the reasonableness of the terms themselves. Id. Applying these factors, we unhesitatingly affirm the trial court's finding that the assignment was not unconscionable. The heirs had meaningful alternatives to IER's services.
On the procedural criterion the parties enjoyed equal footing. The heirs were free to conduct their own search for their inheritance. The Daily Reporter, which published the petition, was available to the public, and public records establishing heirship were as accessible to the heirs as they were to IER. The heirs were under no compulsion to accept the offered services, and Karen was so advised by counsel.
Consideration of facts relating to substantive unconscionability also reveals no undue favor to IER. IER was bound by the terms of the assignment, both to locate Karen and Peter, and to eliminate the possibility of other heirs. As found by the trial court and supported by the record, IER performed valuable services. The letter states that proof of the entitlement will require detailed work from many support personnel at IER's expense. The evidence substantiates work done by *Page 580 
researchers and by IER to provide the information needed to prove the entitlement of Karen and Peter to the estate and to exclude the possibility of other persons having an interest in the estate. Evidence substantiates IER's statement that detailed work was required to prove Karen and Peter's entitlement to share in the estate. The heirs' complaint that they received nothing in exchange for a 40% share of their interest in Katze-Miller's estate is meritless.
Percentage fees are commonplace. Real estate sales fees and attorneys percentage contingent tort fees are customary. Effort expended in heir finding is contingent on the slender expectation that the heir will be found, that the heir will share in the estate, and that the share consists of an amount to make the finder's fee economically reasonable. As noted by the trial court, IER spreads its fees over numerous heir finding endeavors, some of which are not successful.
REDUCTION OF FEES
The heirs urge us to determine that the trial court should have reduced IER's fee, approximately $360,000, to a reasonable amount. They note that the trial court ruled upon the reasonableness of fees to the personal representative, the estate's attorney, and the guardian ad litem. All were computed at an hourly rate. They argue that IER's own genealogical expert suggested, on the basis of the facts and certain criteria, that the fee for IER should have been smaller. In effect, the heirs seek on appeal to reform the assignment.
This argument was not included in the heirs' Statement of Issues filed in the trial court. The trial court did not consider or decide the assignment's reformation to reduce the percentage fee. Under these circumstances, *Page 581 
we need not, and given the facts of this case, we shall not consider reformation of the assignment. See Zeller,125 Wis.2d at 35, 370 N.W.2d at 812.
CROSS-APPEAL FOR 12% INTEREST AND DOUBLE COSTS
IER cross-appeals an order that denied its motion for double costs and 12% interest as provided by sec.807.01, Stats.[17] IER served an offer upon the heirs' counsel on October 14, 1987, which would have reduced its assigned claim to 24%.[18] The heirs did not accept the offer. Trial of the issues commenced April 26, 1989, and *Page 582 
after adjournments, was completed May 24, 1989. The trial court denied the motion because the personal representative deposited the heirs' share, by stipulation of the parties, into an interest-bearing escrow account in September of 1987. Under the stipulation terms, withdrawals from the escrow account could only be made pursuant to court order. The trial court reasoned that the heirs had no property right to the estate funds until an order of distribution assigning the money was entered.
The facts regarding this issue are undisputed. Application of a statute to a given set of facts presents a legal issue to which we give no deference to the decision of the trial court. Tenpas v. DNR, 148 Wis.2d 579, 582,436 N.W.2d 297, 298 (1989).
Relying on Knoche v. Wisconsin Mutual InsuranceCompany, 151 Wis.2d 754, 758-59, 445 N.W.2d 740,742-43 (Ct.App. 1989), IER argues that the heirs were afforded an opportunity to settle, that they did not accept IER's offer, and therefore should suffer the statutory sanction. In Knoche, the offeror, an injured victim of a tort, was the owner of a cause of action upon which he could effect settlement of the dispute. The heirs rely on Upthegrove Hardware, Inc. v. Pennsylvania LumbermansInsurance Company, 152 Wis.2d 7, 13,447 N.W.2d 367, 369 (Ct.App. 1989), and argue that because they did not own or control the fund, they derived no benefit from it.
We conclude that sec. 807.01, Stats., does not apply because the parties stipulated to disposition of the fund.[19] The deposit into an interest-bearing account *Page 583 
safeguarded the income concerns of the ultimate victorious party. The funds in dispute are held in an escrow account by First Wisconsin for the benefit of all interested parties. This escrow was established by the stipulation of all parties, including IER, and expressly provides for the investment of the money in U.s. Treasury Notes earning an average of about 10%.[20] An interest award to IER under sec. 807.01(4) is not appropriate since the *Page 584 
heirs did not hold the money during the pendency of the controversy, nor did they benefit from the use of that money.
In any event, the heirs could not accept IER's offer because they owned no property interest to which the offer could relate or from which payment could be made. Katze-Miller's property interests vested in the personal representative upon issuance of testamentary letters. Section 857.01, Stats. Although a personal representative may, pursuant to sec. 863.01, distribute certain property during probate, complete distribution of the estate follows a hearing on the final account. Section863.25, Stats. The proof of heirship is only evidentiary. Heirship is not adjudicated until entry of the judgment, which has yet to occur in this estate. Section 863.27, Stats. In J. I. Case Threshing Machine Company v. Miracle,54 Wis. 295, 11 N.W. 580 (1882), the Wisconsin supreme court determined that a judgment debtor's legacy in an estate cannot be reached by garnishment upon the personal representative prior to the final order of distribution. After judgment assigning the estate, the heirs acquire title. Sections 863.27 and 863.31, Stats.
Furthermore, we are satisfied that sec. 807.01 does. not apply to interests in estates. The words "party," "plaintiff," "defendant," and "recovery of judgment," are foreign to probate. Absence in the statute of any reference to heirs, devisees, personal representatives, distributive shares, or final judgment is significant. The parties cite no authority which applies the settlement statute to interests in pending estates and we are aware of none. Chapter 807 was created by supreme court order, *Page 585 67 Wis.2d 740 (1975). Extension of sec. 807.01 to estates would entail careful drafting of an amendment or addition to the rule. It is inappropriate for us to assume this task. Any such endeavor should be undertaken by the supreme court under its rule-making power. See, e.g., State v.Lynch, 82 Wis.2d 454, 466, 262 N.W.2d 773, 779 (1978).
By the Court. — Order affirmed.
[1] International Equity Research Corporation, a Minnesota corporation, of which Paul R. Noot is vice-president, is a joint venture with Research Service International, a sole proprietorship owned by Alan C. Noot, Paul's son. The joint venture is based in Minneapolis. IER provides genealogical services, including locating missing and unknown heirs and developing facts supportive of their claims.
[2] Section 879.23(1), Stats., provides in part: "A guardian ad litem may be appointed for persons not in being or presently unascertainable."
[3] Rasch calls herself a part-time genealogist, an unlicensed calling. Rasch has no formal training and receives $6.00 per hour for research efforts. If, as here, she assists in locating an heir, she receives 4% of the heirs' distributive share under a contingent fee agreement with IER. Her commission is paid from IER's 40% fee.
[4] IN RE: UNCLAIMED ASSETS, MISSING UNKNOWN HEIRS
Dear Mr. Van Altena:
 Our firm is in business of locating missing or unknown heirs and owners of various interests, who, for some reason could not be found without a thorough investigation. In the event that an heir or owner is not found, their share normally escheats to the government, or if their identity is completely unknown and there are known heirs, the assets are usually distributed to the known heirs only. Our firm attempts to locate and identify all the entitled parties in these types of cases, and hopefully prevent improper distribution or escheat.
 Our remuneration depends upon our ability to locate the entitled parties and then to make an arrangement with them on a contingent fee basis. On this particular matter we are asking you to allow us a forty percent interest in the unclaimed assets located, and which we believe will be received by you through our services. Because of the risk and expense anticipated in proving your entitlement we cannot reduce our contingent fee. Thus far, it has taken the cooperative efforts of many professionals to locate and identify you. To prove your entitlement will likewise require detailed work from many of our support personnel, at our own expense.
 At no time will we require you to make any cash advances or payments, other than the agreed contingent fee arrangement. Our fee of forty percent will be shared with other correspondent firms who have worked on this case with International Equity Research. In addition, International Equity Research will retain an attorney or law firm to represent you and International Equity Research will pay for all legal expenses, as indicated in the enclosed agreement.
 Again, any retention of legal counsel by International Equity Research will be at the sole responsibility and liability of our firm, and these costs or expenses will in no way reduce the amount to which you might be entitled. The important thing to remember, is you will not be obligated for any of our expenses whatsoever.
 It might be said that the information as to your probable entitlement is our "stock-in-trade", we therefore make it a practice to disclose this information only after we have received a signed agreement from all of the entitled heirs. Upon receipt of all signed agreements, we will forward our report within five days. Until we have these agreements, we cannot divulge any more information concerning your probable entitlement. I trust you can understand our position.
 There are two agreements enclosed which are entitled, "Assignment of Partial Interest". If you decide you would like to work with us on this matter, please execute both agreements, keep the agreement that is stamped, "COPY" for your records. Remail the original to our office in the self-addressed stamped envelope, which is enclosed for your convenience.
 Respectfully submitted, Paul R. Noot International Equity Research
(Underlining in original.)
[5] ASSIGNMENT OF PARTIAL INTEREST
 TO: INTERNATIONAL EQUITY RESEARCH 4707 NORTH WASHBURN AVENUE MINNEAPOLIS, MINNESOTA 55430
 In consideration of your diligent search and investigation which established my whereabouts and brought to my attention certain unclaimed assets to which I might be entitled, and in further consideration of: (1) information given or to be given to me, and (2) your continued efforts to gather all available genealogical information regarding my claim to those assets or a portion of them, I hereby assign International Equity Research a forty percent (40%) interest in such assets.
 International Equity Research is hereby authorized to take the steps necessary to protect and recover my share of the assets, and for that purpose to employ legal counsel of their choice, if needed, at their expense. This means that while the employment of legal counsel by International Equity Research would be to establish my rights to the assets and distribute them, I am not in any way liable for such legal fees.
 I further understand that I have no personal responsibility to International Equity Research for any kind of costs or expenses whatsoever, and that International Equity Research will never request any payments or reimbursement. Additionally, costs incurred by International Equity Research will in no way reduce the amount to which I might be entitled.
 This assignment is given with the understanding that if it is found I am not entitled to these certain unclaimed assets, International Equity Research will not be entitled to receive any fee or interest from me, and I will not be liable or obligated to International Equity Research for any costs or expenses.
 After receiving signed agreements from all the entitled heirs, International Equity Research will mail a report which explains the nature of my entitlement and the source from which I could expect any assets. This assignment ONLY applies to the single source disclosed in the report issued by International Equity Research. This means that International Equity Research will not have any interest or claim, now or in the future, other than that which is outlined in the report. This assignment does not apply to any assets or property that I now own.
 In the event of my death or incapacitation before distribution is made of the assets to which I might be entitled, I bind this agreement to my heirs, executors, administrators, guardians, conservators and assigns. This is simply to ensure that International Equity Research receives their interest for completion of their work on my behalf.
Signed in duplicate this _____ day of _____, 19__.
(Underlining and capitalization in original.)
[6] The inventory valued administration property at $2,677,666.64. In his written memorandum of decision, the trial court stated, without gainsay in the parties' briefs, that the value of the heirs' bequests is $815,000.00.
[7] Because the assignments are identical, they will be treated collectively as, the assignment, for purposes of clarity.
[8] The heirs cite no authority in support of this argument. Arguments unsupported by references to legal authority will not be considered. State v. Shaffer, 96 Wis.2d 531, 545-46,292 N.W.2d 370, 378 (Ct.App. 1980).
[9] See sec. 879.23, Stats. We have found no case law which imposes this or a similar duty upon a guardian ad litem.
[10] Karen's and Peter's solicitation was by mail, not signed by them for several days, and then only after Karen contacted two lawyers and Peter considered consulting one. There is no evidence of fraud or unconscionable conduct to render the assignment violative of public policy.
[11] Section 856.05(1), Stats.
[12] Section 856.07(1), Stats.
[13] Section 863.27, Stats.
[14] Ollerman involved an experienced real estate vendor and an unsophisticated vendee.
[15] The heirs' Statement of Issues filed in the trial court demanded a judgment declaring the assignment void. The trial court treated it as a petition for rescission. Because the heirs did not object on appeal, we also treat this as a rescission issue.
[16] The court quoted at length from Allen v. Michigan BellTelephone Company, 171 N.W.2d 689, 692-94 (Mich.Ct.App. 1969).
[17] IER argues that sec. 807.01 applies generally without identifying specific subsections. Relevant subsections of sec. 807.01
provide:
 (3) After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. If the defendant accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer, the defendant may file the offer, with proof of service of the notice of acceptance, with the clerk of court. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the mount of the taxable costs.
 (4) If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of on the amount recovered from the date of the offer of settlement until the amount is paid. Interest under this section is in lieu of interest computed under ss. 814.04(4) and 815.05(8).
 (5) Subsections (1) and (4) apply to offers which may be made by any party to any other party who demands a judgment or setoff against the offering party.
[18] Another offer was filed April 21, 1989, but is not material to this appeal.
[19] The relevant portions of the stipulation follow:
IT IS HEREBY AGREED and stipulated among the various parties in interest as follows:
1. An escrow account will be established by First Wisconsin
 Trust Company into which the Personal Representative shall distribute forty percent (40%) of the partial residuary principal distribution shares of Karen K. Gertsch and Peter J. Van Altena which escrow fund shall include collectively the following assets . . ..
 2. No distributions shall be made from said escrow account unless pursuant to further order of the court.
 3. For purposes of any estate income tax returns, the funds placed into the escrow account shall be considered as distributed by the Personal Representative to Karen K. Gertsch and Peter J. Van Altena.
 4. During the existence of the escrow account, all income earned by the assets therein shall be retained by First Wisconsin Trust Company as escrow agent, but shall be considered the income of Karen K. Gertsch and Peter J. Van Altena for income tax purposes. Upon final termination of the escrow account, First Wisconsin Trust Company may reallocate the income earned by the escrow account for income tax purposes among Karen K. Gertsch, Peter J. Van Altena and International Equity Research as their interests are finally determined by the court.
 5. Karen K. Gertsch, Peter J. Van Altena, and International Equity Research, to the extent that their interests in the escrow fund are finally determined by the court, agreed to indemnify and hold harmless the First Wisconsin Trust Company as Personal Representative of the above estate for the above distribution into this escrow account.
 6. This stipulation shall be binding upon the parties, their heirs, legal representatives, successors, and assigns.
[20] Essentially, IER is claiming that the interest provided by the stipulation is exclusive of their right to seek additional preverdict interest under sec. 807.01, Stats. If IER wanted to preserve additional relief, statutory or otherwise, such a right should have been expressly reserved in the stipulation. See WyandotteChems. Corp. v. Royal Elec. Mfg. Co., 66 Wis.2d 577, 589-91,255 N.W.2d 648, 655-56 (1975).