MAUDE E. SPARNE *vs.* LOUIS ALTSHULER *et al.*

AUGUST 12, 1952.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

O'CONNELL, J.    This cause is before us on complainant's appeal from a final decree of the superior court, denying and dismissing the bill of complaint and granting affirmative relief to respondents Louis I. Altshuler and his son Milton S. Altshuler, copartners doing business under the name of Altshuler Genealogical Service.

The bill of complaint seeks primarily the cancellation of two agreements dated September 24, 1948 between complainant and respondents Altshuler and a declaration by the court that said agreements are null and void.

The first agreement reads as follows:

"Whereas, the Altshuler Genealogical Service of Boston, Massachusetts, a copartnership, has certain information concerning a possible inheritance, of which I had nor have any knowledge, and

Whereas, the Atlshuler Genealogical Service has

spent time and money in tracing the genealogy of my family, and

Whereas, additional services have to be rendered in the preparation of charts, the obtaining of vital records, and other data;

Now Therefore, the Altshuler Genealogical Service of Boston agrees to disclose to me information concerning an Estate from which I may share a possible inheritance. For the disclosure of such information to me and for any further services rendered to me by the Altshuler Genealogical Service of a genealogical nature in order to establish my inheritance, I hereby agree to compensate the Altshuler Genealogical Service in an amount equivalent to one-third of whatever proceeds I may receive from said estate by way of distribution as an heir-at-law.

Witness my hand and seal this Twenty fourth day of September 1948

(signed) Harry W. Morse     (signed) Maud E. Sparne
       Witness                     Seal"

The second agreement reads:

"I hereby acknowledge that subsequent to the execution of the contract by me, dated Sept 24, 1948 the Altshuler Genealogical Service disclosed to me that the estate from which I may receive a possible inheritance as an heir-at-law, of Mabel Walker of Providence County Providence State of Rhode Island With full information concerning the source of the inheritance, I now ratify and confirm the aforementioned contract in every respect.

Witness my hand and seal this Twenty fourth day of September 1948

(signed) Harry W. Morse     (signed) Maud E. Sparne
       Witness                     Seal"

The principal grounds relied upon for the cancellation of these agreements are that they are without consideration; that they are against public policy; that they were signed under a mutual mistake of fact; and that they were procured by unconscionable conduct on the part of the respondents.

Service was duly made upon all respondents and each filed

an answer to the bill. The complainant filed a replication to the answers and the cause was then heard on such pleadings and proof thereunder. The justice who heard the testimony died before he could render his decision, and a stipulation was entered into by the parties to the effect that the cause could be assigned to another justice of the superior court for his decision on the basis of the transcript, exhibits and arguments of counsel without further testimony or evidence, such decision by the successor justice to have the same effect, insofar as allowed by law, as though rendered by the justice who heard the cause originally. Pursuant to the terms of said stipulation and the order based thereon, the cause was referred to another justice of the superior court who, on February 19, 1952, entered the decree appealed from.

It appears from the transcript of testimony that the complainant is a widow about seventy-five years of age. In September 1948 she was living alone and in reduced circumstances in her own home in Longmeadow, Massachusetts. She was dependent mainly on the bounty of the town. Her husband had been dead for many years and she rarely visited or heard from whatever relatives she had.

The Altshulers are self-styled investigators and genealogists who are engaged in tracing and locating missing heirs. Their practice is to periodically examine the probate records of New England cities and if they find a sizable estate in which it appears that there may be potentially missing heirs or heirs whose residence is unknown, they begin an examination of pertinent records. When they succeed in locating a person whom they believe to be entitled to a share in such estate they approach him or her with a proposal to exchange their information for a share in the expected estate.

About the middle of July 1948 the son, Milton S. Altshuler, and his brother-in-law Harry W. Morse, then an employee of the Altshuler Genealogical Service and now a copartner therein, were in Providence examining the records

of the probate court. During such examination they came upon a petition for administration of the estate of Mabel Walker of Providence, which had been filed on June 15, 1948. It appeared therefrom that she had died on March 24, 1948, leaving personal estate estimated at $40,000 and naming two cousins as the only known and listed heirs at law. It did not appear whether such cousins were on the maternal or paternal side.

Sensing that there might be other heirs of the deceased, the younger Altshuler and Morse, upon the advice of respondent Louis I. Altshuler, made an intensive and exhaustive search of cemeteries, libraries, historical societies, probate courts, city and county registries of deeds, births, marriages and deaths in Massachusetts, Connecticut and Rhode Island. The completed search finally took them to Maine and New Hampshire and also led them to make inquiries in the city of Washington, D. C. Their investigation was ultimately so successful that they were able as witnesses to establish the fact that complainant was a lawful heir of Mabel Walker.

As a result of their preliminary search respondents, about September 17, 1948, became conclusively convinced that complainant was an heir of Mabel Walker and entitled to a share in her estate. On September 24 respondent Louis I. Altshuler, accompanied by his son-in-law Harry W. Morse, visited complainant at her home in Longmeadow. As a result of such visit and the interview which ensued, complainant signed the two agreements which she now seeks to have cancelled.

The complainant's testimony and that of respondents Altshuler is somewhat conflicting. The former testified she had last seen Mabel Walker when the latter was ten or twelve years old; that Mr. Altshuler told her "there was some money that I would get or that he could have for me, he could get for me"; that he was a genealogist and that "when he found it all, why he took it to the people who he had in mind * * *"; that "he was going to get it"

but "He didn't say that, but I took it as that, that that was his business"; that he left with her a copy of the ratification agreement; and that she signed only one paper.

On cross-examination she admitted that she signed *both* agreements; that before she signed Mr. Altshuler told her she probably had some money coming to her; that from time to time Altshuler advanced her various sums until she went to New Jersey; that she wrote a number of letters and signed receipts for advances; that in March 1949 she received a statement from a Springfield attorney, who was then representing her, showing $4,000 received on account of her claim in the estate of Mabel Walker, out of which $1,333.33 had been deducted for Mr. Altshuler's fee and a further sum of $413.30 to repay advances made to her by him; that in the fall of 1949 she went to New Jersey; that, although she had never expressed any dissatisfaction respecting the services of her attorney or of the Altshuler Genealogical Service, she discharged them both by two letters, one to the attorney dated November 27, 1949, and the other to the Altshuler Genealogical Service dated December 3, 1949.

On redirect examination she testified that after she left Longmeadow in the fall of 1949 and went to visit relatives in New Jersey she consulted an attorney in that state and as a result she sent the above-mentioned discharge letters. On recross-examination she testified that when she signed the agreements she had heard from no one regarding the estate of Mabel Walker; that she did not go to see the New Jersey attorney; that he was a friend of her relatives with whom she was staying; and that she was introduced to him when he came to visit them.

Respondent Louis I. Altshuler testified that when he called upon complainant at her home in September 1948 she had no knowledge that she had any interest in the estate of Mabel Walker; that on this visit he was accompanied by his son-in-law, Harry W. Morse; that during the interview which lasted about three hours he explained

his business, showed her his credentials and told her that the standard fee was one third "of the amount that is recovered"; that he offered to leave with her a form of contract which had been drawn by attorneys; that he explained the first agreement in detail; that before she signed the second agreement he informed her of the identity of the estate; that she did not sign until he had inserted the name of Mabel Walker; that on or about October 5 or 6 he discussed with complainant the advisability of retaining an attorney; that she stated she did not know any attorney and he suggested several among whom was a Springfield attorney whom she then expressed the desire to have represent her; and that thereupon he put her in touch with that attorney who later drew a will for her and represented her until the time of his discharge in 1949.

On cross-examination Mr. Altshuler testified that at the time the agreements were signed there appeared to be no necessity for complainant to engage an attorney, but that later when he learned of the difference between Massachusetts and Rhode Island laws with respect to inheritance he suggested to complainant that she employ an attorney; and that he told her the name of the estate after she had signed the first agreement. She then said to him that she thought Mabel Walker had died a long time ago and that she had not heard from her for forty years.

He further testified that after complainant had signed the second or ratification agreement he told her that Mabel Walker had died in March 1948; that his investigation disclosed that complainant was an heir; that the Mabel Walker estate was estimated to be about $40,000; and that before she signed the contract he gave her a copy, which she followed while he read it to her from another copy. This she later produced at the hearing.

Harry W. Morse, who witnessed both agreements, corroborated much of the testimony of Louis I. Altshuler. He further testified that when Mr. Altshuler asked complainant if she understood everything, she stated: "I understand it

perfectly"; that the ratification agreement was read to her before she signed; that Mr. Altshuler assured her that there was no hurry and that they could come back at another time if she wished; that she stated she did not see why he should come back another time because she wanted him to go ahead.

In a lengthy rescript in which he stated that he had examined the transcript and the exhibits and had weighed the evidence "thoroughly and closely" the trial justice recited the testimony in detail and analyzed it with great care. Based upon his findings he entered the decree appealed from which contained the following express findings of fact: "(1) That the agreements complained of were not without consideration. (2) That said agreements are not against public policy. (3) That said agreements were not signed under a mutual mistake of fact. (4) That said agreements were not procured by unconscionable conduct on the part of the respondents Altshuler."

The complainant concedes our rule of law to be that when a cause is heard before a trial justice without a jury his decision should be entitled to great weight and should not be disturbed unless it is clearly wrong. She argues, however, that such rule should not apply in the instant cause, because the decision was not made by the original trial justice who heard and saw the witnesses, but by another justice who rendered his decision on the basis of the transcript and the exhibits as authorized by the stipulation filed by the parties. Assuming, without deciding, that the general rule should not apply here, we have made a careful and independent examination of the transcript and exhibits and we find therein ample and credible evidence to support his decision and the findings of fact in the decree.

It appears in evidence that from September 1948 to March 1949, because of complainant's financial distress, the Altshulers sent her various small sums of money, aggregating $413.30. In each remittance was enclosed a receipt

which she was requested to sign and return. The complainant not only signed and returned such receipts but during that period she sent at least fifteen letters, many of them of a cordial and friendly nature, expressing thanks for the services rendered by the Altshulers. It was not until she went to New Jersey in the fall of 1949 that she wrote letters of discharge to the Altshulers and her attorney. It is a reasonable inference that she was fully satisfied with their services until through her relatives she was put in contact with the New Jersey attorney. It was not until then, *more than a year* after she signed the contracts complained of, that her attitude changed.

The complainant argues that the agreements were champertous in their nature, against public policy, and therefore illegal and void. In the absence of fraud or unconscionable conduct, which we do not find to exist in the instant cause, agreements of this sort have been uniformly held to be good. In *Wedgerfield* v. *De Bernardy*, 24 T.L.R. 497, a case almost identical with the one at bar, the agreements were held not to be champertous and the action was dismissed. See also *Miller* v. *Anderson*, 183 Wis. 163.

In *Kaplan* v. *Suher*, 254 Mass. 180, in referring to a contract for the sale of information concerning assets of an estate which had not been accounted for, the court used the following language at page 185: "The circumstances that a private contract may be improvident or hard, or prompted by motives on one side or the other perhaps not commendable in the forum of conscience, do not alone constitute ground for refusal to enforce an agreement intelligently and freely made by competent parties standing on an equal footing and by them put under seal."

The complainant contends that the court erred in granting affirmative relief to respondents Altshuler by ordering respondent Howard L. Carpenter, administrator of the estate of Mabel Walker, to pay to them one third of the complainant's share in the said estate, whenever said share should become payable. We cannot agree with this con-

tention. It is a well-settled rule that a court of equity, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties which are connected with the main subject of the suit. The court will then grant all relief necessary to an entire adjustment of the litigated matters, provided they are authorized by the pleadings. *Bosworth* v. *Johnson*, 45 R. I. 86. 30 C.J.S. Equity §68. In the instant cause the relief granted was specially prayed for in the answer of respondents Altshuler and meets the requirements of the *Bosworth* case, *supra*.

Upon a careful examination of the pleadings, transcript and exhibits in the cause, we are of the opinion that the trial justice committed no error in entering the decree appealed from.

The complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

FLYNN, C. J., and CAPOTOSTO, J., dissenting. We are unable to agree with the majority opinion because in our judgment the evidence, when read as a whole, shows that the contract in question was not an agreement solely for the sale of genealogical information, intelligently and freely made by competent parties standing on an equal footing.

We recall that the trial justice who heard the cause died before rendering his decision and that thereafter the parties agreed to submit the cause to another justice of the superior court for determination merely upon the record previously made. It is obvious that in weighing the evidence the latter justice did not have the usual assistance of having seen and heard the witnesses while testifying. Therefore his decision does not come to us with the persuasive force that it ordinarily would have in this court on appeal. In the circumstances we are free to weigh the evidence independently of such decision and to draw our own conclusions from the record as it stands.

We concede that parties may legally enter into a contract for the sale of genealogical information provided, however, that the agreement is strictly limited to the sale of such information and nothing more, and further, that it is intelligently and freely made by competent parties standing on an equal footing. This rule is at the basis of the decisions in *Kaplan* v. *Suher*, 254 Mass. 180, 185, and in *Wedgerfield* v. *De Bernardy*, 24 T.L.R. 497, upon which the majority relies. But neither of those cases involves any real conflict of evidence and both present factual situations that differ materially from the one in the case at bar.

Moreover, it is also worthy of note that in the *Wedgerfield* case the court quotes with approval the appropriate test which it had set out and applied in the earlier case of *Rees* v. *De Bernardy*, 12 T.L.R. 412, where the agreement was held unenforceable and void for the reasons therein stated. In our judgment the facts in that case parallel in all pertinent and material aspects the circumstances appearing, either by direct evidence or by way of reasonable inference, in the record now before us. We forego referring to the facts upon which we base our conclusion because a reading of the whole transcript is necessary to obtain an adequate picture of respondents' conduct, and also because the *Rees* case discloses many details similar to those appearing in evidence in the case at bar. Here, as in that case, respondents' conduct leading up to the making of the agreement and from that time to the termination of the transaction convinces us that on the evidence in the present record complainant was the innocent victim of overreaching and other inequitable practices. In such a situation, as disclosed by this record, the rule hereinbefore stated should be applied in the same manner and extent as in *Rees* v. *De Bernardy, supra.*

It is therefore our opinion that the complainant is entitled to the relief prayed for and that the decree appealed from should be reversed.

ON MOTION FOR REARGUMENT.

OCTOBER 24, 1952.

PER CURIAM.   After our opinion in the above cause was filed, the complainant requested and received permission to present a motion for leave to reargue.   Pursuant thereto she has filed such a motion, stating therein certain reasons on which she bases her contention that justice requires a reargument of the cause.   We have carefully considered those reasons and a majority of the court are of the opinion that they suggest no point which we have not already considered or which in the circumstances warrants such reargument.

The motion is denied, and on October 31, 1952 the parties may present to this court for approval a form of decree, in accordance with the opinion, to be entered in the superior court.

*Wilfrid E. McKenna, Augustus Nasmith,* of New Jersey Bar, for complainant.

*Sherwood & Clifford, Sidney Clifford, Raymond E. Jordan,* for respondents.