[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is an action by several insureds under policies of insurance issued by the defendant Prudential Insurance Company of America. The plaintiff insureds seek to enjoin the defendant, hereinafter referred to as Prudential from cancelling their policies, and/or in the alternative, to recover damages in an amount sufficient enough to enable them to obtain similar policies of insurance from another insurer. Plaintiffs, in addition have requested punitive damages and counsel fees.
By stipulation of the parties, and Order of the Superior Court dated March 31, 1989, each of the insurance policies in question in this litigation were to be kept in full force and effect by Prudential so long as the plaintiffs continued to make the premium payments as required by the "prior contract of insurance" offered to them by Prudential's Agent Alex E. Mazika. That stipulation, while not of seeming significance to all plaintiffs, is significant with particular regard to plaintiff Kevin Doorley who deceased during the course of this litigation on December 5, 1992. Capuano v. Kemper Ins. Companies,433 A.2d 949, 955 (1981).
The case was reached for trial and heard by the Court sitting without a jury. After the close of the evidence, the defendant Prudential moved to further amend its amended answer so as to include therein prayers for reformation or rescission of the insurance contracts. That motion, over plaintiffs' objection, was granted by the Court. Counsel requested permission to file post trial memorandum. Same have been filed and considered by the Court. Decision is now made and entered pursuant to Rule 52R.C.P.
The facts underlying the legal issues raised by the pleadings and the evidence while somewhat concise, are controverted.
Alex E. Mazika, a former defendant, had been employed for some twelve years prior to May 7, 1987, as an agent by Prudential to sell insurance policies. In that capacity, he became one of Prudential's most productive sales agents. In the course of his employment he had been encouraged by Prudential to market and sell its "Citation 50" policy and use as inducement, a so called abbreviated premium payment plan. That plan was commonly known by its initials to Prudential agents as the V.O.P. plan and was specifically tailored for use with Prudential's "Citation 50" policy.
Anthony Russo, a retired Prudential Vice President for Regional Marketing testified that the V.O.P. premium plan, was one which allowed an insured to borrow against a policy's cash value and to also use dividends to pay policy premiums. He testified that the plan was available to Prudential agents and was particularly suited for use with Prudential's "Citation 50" policy. Its particular suitability was because the much larger than usual initial policy premiums at that time were tax deductible, making the plan most attractive to successful businessmen, able to afford the much larger, but shorter, premium payment schedule. Accordingly, Agent Mazika was using what Prudential had made available to him and other agents for purposes of selling Prudential's "Citation 50" policy to select businessmen looking for tax advantages as well as insurance coverage protection. Anthony Finocchio, Prudential's and Mazika's District Sales Manager at the times in question testified that the "Citation 50" policy was different from ordinary life insurance policies that Prudential sold, in that it had a higher minimum face value and had a first year cash surrender value which other Prudential policies did not have. He also testified that the "Citation 50" policy was especially attractive to business people because when sold in conjunction with Prudential's variable option outlay or premium plan, it would permit the policyholder to borrow from the policy's cash surrender value and use dividends from the policy to pay premiums. Consequently, when Mazika solicited insurance purchases from each of the plaintiffs on behalf of Prudential, he was using and utilizing the sales techniques and the policy programs made available to him by Prudential. The real problem with regard to what Mazika had to work with from Prudential was that the variable outlay plan for payment of premiums was nothing more than a "concept". As admitted by Prudential's District Manager Finocchio, both in testimony as well as in his deposition (P. 34), the V.O.P. plan was nothing but a "concept", to be used and explained to a prospective insured by an agent. Anthony Amaral, Mazika's Sales Manager for Prudential testified that he was aware of the V.O.P. plan, but had no idea of when it originated, and that he had never used it, but that it was part of Prudential's sales program for marketing its policies. Mazika, during the time that each of the plaintiffs purchased their Prudential "Citation 50" policies was without question, a Prudential insurance policy sales agent. In that capacity, he had authority, real, or apparent, from Prudential to sell its "Citation 50" policies and in doing so, to utilize and explain the V.O.P. abbreviated premium payment concept plan and its particular advantages and unique relationship to that policy. This litigation concerns not that he did so, but instead, in the manner in which he explained and described the so called V.O.P. abbreviated premium payment plan to prospective insureds. While it is clear that Mazika's explanation of how the V.O.P. plan worked was partially erroneous, that explanation was nonetheless characterized at the trial by Anthony Russo, Prudential's Vice President for Regional Marketing as being totally honest and innocent error. The flaw in Mazika's explanation to each of the plaintiffs was that he omitted to include in his presentation that while the V.O.P. premium payment plan when used in conjunction with the "Citation 50" policy would permit a policyholder to borrow against the policy's first year cash surrender value and also use policy dividends to pay premiums, he neglected to inform the intended policyholder that he would be required to pay interest on the amounts borrowed. Unfortunately, that loan interest omission went undetected by Prudential until Mazika had sold many policies, including those few involved in this litigation. Mazika's error was, while undetected, also innocently compounded by his District Manager's actions at one of the most crucial times concerned in the scenario giving rise to this litigation.
One of the plaintiffs, James Doorley had been solicited by Mazika to purchase the "Citation 50" policies and had been given the V.O.P. abbreviated premium plan explanation by Mazika. Because of the large face amount of the policies being considered, and because of questions that Mr. Doorley had concerning the workability of the V.O.P. plan as explained to him by Mazika, Doorley arranged to meet with his attorney, Walter Gibbons, of Armstrong Gibbons, to discuss the intended policy purchases and the workability of the abbreviated premium payment plan. Acting with commendable caution, Attorney Gibbons referred the V.O.P. premium schedule plan to a Mr. Pauli, at Financial Insurance Services, Inc. for evaluation. Mr. Pauli reported back to Attorney Gibbons that the abbreviated premium payment plan as submitted to Doorley by Agent Mazika "would not work". As a result of that opinion, Attorney Gibbons set up a meeting with Mr. Doorley and Agent Mazika in December of 1986. Agent Mazika brought along his immediate Prudential supervisor and District Manager, Anthony Finocchio. At that meeting the Prudential-Mazika V.O.P. abbreviated premium payment plan explanation was both questioned and examined in light of the Pauli criticism report. (Deft's Exh. L) Finocchio testified that at that meeting, he not only encouraged Doorley to purchase the policies, but also told Attorney Gibbons that "he could have thought less of what that guy (Pauli) said "about the feasibility and correctness of Mazika's description of Prudential's V.O.P. plan. Finocchio testified to that same extent in his pretrial deposition at page53 therein. Had Finocchio detected the innocent interest omission, this entire litigation might have been avoided, because not only did James Doorley purchase the "Citation 50" policies, but he later recommended Prudential's "Citation 50" policy and Agent Mazika to his friends and business acquaintances who are now also plaintiffs in this case.
Some months after the "Citation 50" policy sales by Agent Mazika to each of the plaintiffs, and as his popularity and sales accomplishments as a Prudential agent were recognized within the Prudential organization, Prudential decided to honor him. Prudential invited Mr. Mazika to a Prudential award ceremony being held in Boston. At that ceremony, he was honored for his successful and fascinating sales career with Prudential and given what was referred to at trial as Prudential's "Ring of Champions". That finger adornment was also described as being sort of a "Super Bowl Championship" ring.
In Boston at the same time by coincidence, were other Prudential executives, including Phillip D'Achille, one of Prudential's home office Vice Presidents responsible for marketing support for all of Prudential's district agencies. He had some time earlier received a complaint from a Prudential "Citation 50" policyholder regarding what just honored Agent Mazika had represented to him concerning the V.O.P. abbreviated premium payment plan. D'Achille thought it would be prudent to have Agent Mazika meet with him and put on a complete demonstration of his sales presentation method which had proven to have been so successful, and which had earned him Prudential's "Ring of Champions". Mazika did. Present at that sales technique presentation were Anthony Russo; Donald Garvey and Prudentials' house counsel, attorneys Cook and Fahey. After the presentation had been completed, D'Achille informed Agent Mazika that his presentation was not entirely correct. It had omitted to note that interest on the cash value loans had not been computed or figured into Agent Mazika's abbreviated premium payment projections. Agent Mazika was then told to take steps to correct the innocent omission. Mazika testified that he did what he was instructed to do, but Prudential disputes that. At trial, Mr. D'Achille did concede that the variable option payment V.O.P. concept conceived by Prudential and as used by Agent Mazika would not have alerted a prospective insured to the fact that the three year, high initial premium payment plan proposal being used by Agent Mazika, was not accurate or workable. The testimony of Prudential's Anthony Amaral is also interesting in regard to Prudential's V.O.P. plan. He testified that while he did not know when Prudential first devised its variable outlay premium plan, or concept, which he knew would have enabled businessmen to deduct insurance premiums under a certain Internal Revenue Code provision, or when Prudential ceased using it, the V.O.P. concept was nonetheless available for use by his Prudential agents, including Mazika, at the time the policies in question here were marketed and sold by Agent Mazika to the plaintiffs. Prudential cannot claim in good faith, as it apparently attempted to do at trial, that it was unaware of Agent Mazika's sales technique and of his admittedly negligent V.O.P. representations being made to the plaintiffs in conjunction with his sale of its "Citation 50" policy. In each policy — there is contained in the application and/or change of policy form, specific mention by Agent Mazika, generally as follows:
 "Policy to VOP dividends to purchase OYT balance P.U.A.'s issue without waiver or premium."
Prudential cannot deny it noted that wording by its agent, because in the case of the policies issued to James H. Doorley, Jr., Prudential back dated his policies to accommodate Agent Mazika's request to do so. That back dating of policy request by Agent Mazika was included as part of his "policy to V.O.P. dividends" instruction to Prudential. Prudential cannot now claim that it did not read the application. F.D. McKendall Lumber Co.v. Kalian, 425 A.2d 515, 518 (1981).
It should also be specifically noted that Prudential's at trial claim that as soon as it learned of Mazika's innocent misrepresentations concerning the V.O.P. concept for premium payment it immediately curtailed his sales representations marketing method concerning borrowing against policy cash value to pay premiums, is totally without merit. On March 31, 1987
Anthony Russo, Prudential's Vice President for Regional Marketing wrote a letter to Agent Mazika, and told him that representatives of Prudential's Marketing Practices Division were investigating his premium financing sales technique. Agent Mazika was then specifically ordered by the Vice President for Regional Marketing, by that letter on March 31, 1987 as follows:
. . . "Until this investigation is completed, I have no choice but to tell you that you are to cease all sales activity which involves any financing. Specifically, you are not to sell or illustrate any policy which anticipates loans to be used to pay any portion of the premium. This includes loans on the policy being sold as well as any in force policy. Please sign the statement below and return to me."
Agent Mazika, as requested, signed the letter, acknowledging receipt, and returned it to Prudential's Vice President for Regional Marketing. (Pltfs Exh. 47) Five weeks later, the applications by Robert E. Doorley for two one million dollar policies and an application from James H. Doorley, Jr. for one, one million dollar policy was forwarded by Agent Mazika to Prudential for acceptance. In each of those policy applications there was contained the very same financing and anticipation of loans plan to pay premiums, namely the V.O.P. premium payment concept, in conjunction with the "Citation 50" policies being sought. That was exactly what had earlier been condemned by Prudential on March 31, 1987. In the applications of Robert E. Doorley dated May 5, 1987 not only is the V.O.P. premium financing and payment concept requested by Agent Mazika, but in addition, Prudential was requested to back date the 2 one million dollar policies to April 10, 1987. Prudential did, exactly as requested by Agent Mazika. It did the very same for the one million dollar policy issued to James H. Doorley. Prudential apparently did not know or care about what its Vice President for Regional Marketing had written to Agent Mazika on March 31, 1987, or perhaps does not now want to be reminded of that letter. (Pltfs Exh 47)
It becomes obvious to this Court that Prudential was totally aware of what its Agent Mazika was representing to the plaintiffs as well as to other prospective Prudential customers. He was representing to them the selling techniques concept devised by Prudential and given the nebulous title or label as the V.O.P. plan which was geared especially for use with the "Citation 50" policy to entice successful businessmen interested in premium deduction tax advantages. When Prudential suddenly discovered that its V.O.P. concept was flawed and unprofitable, it elected to gloss over the problem by simply sending out policies with a new and different premium payment schedule attached to the policies, and which would now make the policies profitable for Prudential. Naturally when those policies were received by the various plaintiffs, they became concerned, because those premium schedules were entirely different and larger than as had been represented by Agent Mazika. Accordingly, the plaintiffs next did what each of their Prudential policies specifically instructed them to do if they had any question concerning their policies. That instruction, contained on the face page of their policies, told them to contact their Prudential agent. They did. They contacted Agent Mazika and he told them essentially to ignore the new premium payment schedule attached to the policies and that his original premium payment schedule plan, the V.O.P. concept plan, would govern their insurance policies. That disagreement between Prudential and its Agent Mazika resulted in his being asked by Prudential to resign. Mazika on May 7, 1987, did resign. In Prudential's letter acknowledging Mazika's resignation, it is interesting to note that Prudential advised Mazika that it was retaining its "proprietary interest in each of its life insurance policies" and for Mazika not to interfere with its property right in those policies by contacting the insureds. In short, Prudential did not like what Mazika represented to the plaintiffs in order to have them buy Prudential policies, but nonetheless it wanted to keep those policies.
It should also be noted that in each of the insurance policies issued to the plaintiffs, there is a total absence of any reference, explanation or definition as to the term, plan, or wording, of "variable option premium payment, V.O.P." etc. That absence is despite the fact that Prudential had knowledge that its agents were using that variable premium payment plan marketing approach in conjunction with the sale and marketing of its "Citation 50" policies. The obvious and apparent reason for that absence of definition or explanation is as testified to by its District Sales Manager Finocchio, namely, that it was just a Prudential sales "concept". Webster's Dictionary defines "concept" as and "idea" or "notion". As a result of Prudential's actions, it was certainly not unreasonable for persons such as the plaintiffs to request explanation from their agent, Mazika. It was certainly not unreasonable also for the plaintiffs to rely upon the explanation given by Mazika, who by the express written authority from Prudential, contained on its policy face sheet, was authorized to answer any questions that the plaintiffs had concerning their policies.
In the course of the trial some thirteen witnesses testified. Plaintiffs Frank R. Campbell; James H. Doorley, Jr.; Dr. Arthur B. Cuddy; Robert E. Doorley, and Michael A. Cuddy all testified with regard to how and why they agreed to purchase the Prudential policies in question. This Court is totally satisfied as to the truthfulness of each of their testimonial recollections. Each testified candidly and honestly. The Court was particularly impressed with the testimony of James H. Doorley, Jr. with regard to the care and caution he exercised before purchasing his Prudential policy. After having been solicited by Agent Mazika, and given the V.O.P. "Citation 50" marketing and sales presentation by Mazika, Mr. Doorley then, as related earlier, consulted and met with his attorney, Walter Gibbons, of Armstrong Gibbons, to discuss the V.O.P. "Citation 50" proposal. Attorney Gibbons referred the proposal to Financial Insurance Services, Inc., for review and evaluation. A Mr. Pauli, for Financial Insurance Services, Inc. responded to Attorney Gibbons' inquiry and reported that Agent Mazika's premium proposal "would not work". As a result, a meeting on December 11, 1986 was scheduled and held at Attorney Gibbons' office. (Not November 26 asrecalled by Mr. Doorley) At that December 11th meeting with Agent Mazika present, was Anthony Finocchio, Mazika's immediate supervisor and District Manager. Finocchio testified that he was present at the meeting to lend "prestige" to Agent Mazika's sale of the policies and that when the Pauli criticism of the proposal was brought up, Finocchio said in his deposition that "that's that man's opinion" and testified that he "could have thought less of what that guy said," and that Pauli's critique of the proposal was faulted by his use of a 13% interest calculation on the policy loan feature of the proposal. At trial, Finocchio testified that he never told Attorney Gibbons to advise the Doorleys not to buy the Prudential policies, and that he encouraged the sale. As a result the Doorley policies were purchased, after Doorley first cashed in three of his then existing life insurance policies, and used the funds therefrom to fund the V.O.P. "Citation 50" policies marketed by Agent Mazika. Doorley relied not only on Agent Mazika's representations, but also in the actions and statements of Mazika's immediate supervisor, Prudential District Manager Finocchio.
This Court is likewise totally satisfied with the credibility of the trial testimony given by witnesses Lorraine Bouchard; Cecile Fisette; Phillip D'Achille; Donald Garvey and Anthony Amaral. As to the credibility of Anthony Finocchio, this Court has difficulty in finding total credibility. This Court is satisfied that Finocchio's trial testimony and his deposition testimony makes clear the fact that Finocchio was fully aware of the details of the V.O.P. "Citation 50" sales representations being made by Prudential's Agent Mazika. Also, that Finocchio fully approved and defended Mazika's representations until the home office began to reconsider what it had developed as a sales "concept", namely the "variable outlay plan" to be used in conjunction with its "Citation 50" policy. It was not until later when Agent Mazika received his "ring" in the morning and his kick in the pants in the afternoon in Boston, that District Manager Finocchio decided to abandon Mazika and protect his own position in Prudential. In leaving Finocchio, it is interesting to note, that after Agent Mazika was terminated by Prudential, it was Finocchio who later delivered the three one million dollar policies to the Doorley's and who then began to service those policies.
From its review of the trial evidence and the exhibits, this Court finds that at the time of the sale of each of the insurance policies in question that Alex E. Mazika was employed as a policy selling agent for Prudential. That as a selling agent he was authorized by Prudential to use available Prudential marketing plans and techniques in order to sell Prudential policies. That one such marketing plan and technique was the so called variable outlay plan, "V.O.P." which was available to Prudential selling agents and could be used by them in marketing Prudential's "Citation 50" policy so as to take advantage of internal revenue code provisions permitting tax deductions for premiums. That Agent Mazika used the variable outlay plan information made available to him by Prudential and honestly, and in good faith, relayed that variable outlay plan information to each of the plaintiffs. That each of the plaintiffs relied in good faith upon the variable outlay plan representations and purchased the "Citation 50" policies from Prudential. That at no time prior to the sale of each of the policies in question did any of the plaintiffs, or Agent Mazika have any reason to suspect or question the reliability or validity of the premium features represented by Agent Mazika in his explanation to them of Prudential's variable outlay plan premium payment concept. That Agent Mazika was a duly authorized selling agent for Prudential with both real and/or apparent authority to make statements to prospective Prudential insurance policy purchasers concerning the premium payment features and tax advantages in the variable outlay premium plan and its unique compatibility with Prudential's "Citation 50" policy. That after the sale of its policies to each of the plaintiffs, Prudential attempted to unilaterally change and amend the insurance contracts it had previously entered into through its duly authorized agent. Prudential admits in its Answer to the plaintiffs' Complaint that its Agent Mazika made "erroneous misrepresentations" to the plaintiffs and that it had advised the plaintiffs that they could have their premiums repaid to them and their policies cancelled, or they could agree to pay the new rate of premiums selected by Prudential and retain the policies. In effect, Prudential as noted earlier, realizing that the plaintiffs had the better of the contracts wanted to change or amend the contracts so that Prudential would have the better of them, or failing that, simply call everything off and give back to the plaintiffs their paid premiums.
Prudential in its amended Answer, filed after the close of the evidence, also seeks reformation or rescission of the contracts.
Under our established law, a valid contract between parties can only be terminated or amended by mutual agreement, by completion thereof or by reformation, rescission or abandonment. That law applies to insurance policies as well as to other contracts. Ferla v. Commercial Casualty Ins. Co., 74 R.I. 190, 195 (1948).
The plaintiffs here seek injunctive relief against Prudential so as to prevent prudential from unilaterally terminating their insurance contracts. Prudential on the other hand seeks to reform or rescind those contracts.
Plaintiffs' burden of proof is to prove that they are entitled to the relief they seek by the fair preponderance of the credible evidence. The defendant Prudential, because of the nature of its defense, has no burden of proof as pertains to the plaintiffs' claims, but with regard to its claims for reformation and/or rescission of the contracts has dual burdens. On Prudential's claim for reformation, it must prove its right thereto by clear and convincing evidence. Hopkins v. EquitableLife Assurance Society, 107 R.I. 679, 685 (1970); N.E. Box Barrel Co. v. The Travellers Insurance Co., 63 R.I. 315, 320 (1939). On its claim for rescission Prudential must prove its right thereto by only the fair preponderance of the evidence.Dudzik v. Leesona Corporation, 473 A.2d 762, 766 (1984);Halpert v. Rosenthal, 107 R.I. 406, 419 (1970).
The basic question for resolution in this case is whether or not Prudential is bound to the insurance contracts negotiated by their Agent Mazika with each of the plaintiffs, and whether such contracts are subject to reformation or rescission.
The facts present in this case are not usually encountered. In all of the insurance company cases reviewed by the Court, whether those cases be Rhode Island cases, or cases from other jurisdictions, one finds that in each, it is the insurance company that seeks avoidance of the insurance contract because of representations made to their agent by the insured. In this case, however, the insurance company seeks avoidance of the insurance contracts because of representations made not to, but instead,by its agent to the insured. Without being facetious, instead of the cat chasing the mouse, the mouse is chasing the cat.
The plaintiffs here in this case are seeking to retain the insurance policies marketed and sold to them by Prudential's agent upon the same favorable premium terms represented to them, or, in the alternative, damages.
The evidence as viewed by the Court discloses without question that Mazika was Prudential's agent when dealing with each of the plaintiffs. In addition it compels the finding that Mazika as Prudential's agent had real authority and/or apparent authority from Prudential to make the V.O.P. abbreviated premium payment concept presentations to each of the plaintiffs at the time each of the policies were solicited, negotiated and contracted for. Those representations by Mazika, while admittedly not complete, were not false representations, but instead were good faith innocent representations.
In order to prove and show the apparent authority of an agent, in this case Mazika, to do a certain act, or to make a certain statement or representation, the plaintiffs had to show that Prudential had manifestly consented to the exercise of such authority by Mazika or had knowingly permitted him to assume the exercise of such authority, and that the plaintiffs knew of that fact and, acting in good faith, had reason to believe and did actually believe that Mazika had that authority to represent policy premium costs to them. Soar v. National Football LeaguePlayers Ass'n., 438 F. Supp. 337, 342 (1975). The testimony of Prudential's District Manager, Anthony Finocchio, and of Anthony Russo, retired Vice President for Regional Marketing, as well as the testimony of Anthony Amaral, Prudential's Sales Manager, clearly established that authority in Mazika. Each of the plaintiffs relied in good faith upon not only Mazika's real and/or apparent authority from Prudential, but also, the apparent truthfulness of his V.O.P. premium payment representations. At least two of the plaintiffs, James Doorley and Dr. Cuddy, in good faith reliance upon Mazika's representations cashed in existing policies with other insurers in order to pay the high initial premiums required by their new Prudential policies. Speaking coldly, and in everyday parlance, the plaintiffs have the better deal, but Prudential believes that it should have the better deal. This Court knows of no law that requires only the insurance company to have the better deal and not the insured.
In 12 Williston, Contracts (Jaeger 3rd ed. 1970) at p. 400-01 Professor Jaeger states that a contract may not only be rescinded for fraud or misrepresentation, but also for innocent material misrepresentations. Our Supreme Court has long recognized that law. Halpert v. Rosenthal, 107 R.I. 406, 413 (1970). In Halpert, supra, p. 413-415, our Supreme Court citing long established legal precedent acknowledges that when a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's
material misrepresentation whether that representation be fraudulent or innocent, the transaction is voidable as against the latter. That means the plaintiffs may void the transaction, not Prudential, on the facts present in this case. The Halpert case, p. 415, actually zeroes in on the issue in this case. There the Court states:
 "the question to be resolved in determining whether a wrong committed as the result of an innocent misrepresentation may be rectified is succinctly stated in 12 Williston, supra § 1510 at 462 as follows":
 "When a defendant has induced another to act by representations false in fact although not dishonestly made, and damage has directly resulted from the action taken, who should bear the loss?" "The question we submit is rhetorical. The answer is obvious. Simple justice demands that the speaker be held responsible."
In this case, the speaker was Alex Mazika, Prudential's agent. The agent speaker's representations whether innocent, or negligently made are the principal's, in this case Prudential's, responsibility. A.A.A. Pool Service v. Aetna Casualty SuretyCompany, 479 A.2d 112, 115 (1984). The mere fact that Prudential will end up with a loss instead of a profit on its insurance contract with any of the plaintiffs does not automatically justify its setting the contract aside. Grady v. Grady,504 A.2d 444, 447 (1986).
This Court, having reviewed and considered the trial evidence and exhibits, finds that the plaintiffs have proven by far more than the required fair preponderance of the evidence that each, while acting in good faith, were induced to enter into the insurance contracts in question by reason of the innocent and perhaps negligent representations made to them by Prudential's agent, Alex Mazika. It finds those contracts not to be unconscionable.
The Court further finds that at the time that Agent Mazika made the representations he was then acting clearly within the scope of his agent employment authority for Prudential and that he had Prudential's authorization to make the representations regarding the cost to each of the plaintiffs for the insurance policies in question. If those representations were inaccurate, it was Prudential's fault and not the plaintiffs, neither of whom had any knowledge of, or reason to know of any inaccuracy in the representations.
The Court also finds that Prudential has failed to meet and carry its burdens of proof as earlier herein defined, so as to satisfy this Court that it is entitled to either reformation or rescission of any of the insurance contracts in question. Prudential has shown no mutual mistake of any material fact between Mazika and any of the plaintiffs when dealing with Prudential's Agent Mazika. Vanderford v. Kettelle, 75 R.I. 130, 139, 142 (1949). There were no representations made by any of the plaintiffs which caused Prudential to enter into its insurance contracts and upon which Prudential can base a claim for rescission. Dudzik v. Leesona Corp., 473 A.2d 762, 767 (1984). The only representations involved in this case, were made by Prudential's Agent Mazika. As noted in Halpert v. Rosenthal,
supra, at p. 413:
 ". . . it would be unjust and inequitable to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations."
The law assumes that a party to a contract will proceed in good faith to carry out and abide by the terms of that contract and not neglect the contract terms to suit its own convenience or profit. Jakober v. Loews Capitol Theatre. Inc., 107 R.I. 104, 114 (1970).
In this case, Prudential because of its unprofitable contracts with the plaintiffs has attempted to unilaterally call off and renege on those contracts and give the plaintiffs back their paid premiums. Such action cannot be condoned by this Court sitting in Equity. Neither can this Court in Equity permit Prudential to unilaterally demand that its contracts with each of the plaintiffs be changed or amended so as to insure a profit to Prudential.
Such actions on the part of Prudential makes it vulnerable to the plaintiffs request for specific performance. While the grant of specific performance relief is not a matter of right, but rests in the sound discretion of the Court, in this case, the facts compel the Court to exercise its discretion in favor of the plaintiffs' request. Accordingly, the plaintiffs' prayer for permanent injunction against the defendant Prudential is granted. Prudential be and is hereby permanently enjoined from cancelling its policies of insurance with each of the plaintiffs except for non-payment of premiums or other cancellation provisions contained in the contracts. The premiums required to be paid to Prudential are those previously negotiated for, represented and agreed to by Prudential's agent Alex Mazika, and each of the plaintiffs.
In addition, it is well-settled law that a Court of Equity when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties which are related to the main subject of the suit.Sparne v. Altshuler, 80 R.I. 96, 105 (1952). This Court, accordingly, by specific mandatory injunctive order, orders Prudential to comply with its contractual obligation and pay to the estate of Kevin P. Doorley, who died on December 5, 1992, or to the named beneficiary in his insurance contract, the death benefits provided for therein. As noted in Capuano v. KemperInsurance Companies, 433 A.2d 949, 955 (1981).
 "It is well settled that an insurance company cannot cancel a policy . . . after loss has occurred and liability has attached."
This Court further finds that there were justiciable issues of either law or fact raised by Prudential and that accordingly the plaintiffs are not entitled to be reimbursed for all legal fees and court costs incurred by them in this litigation pursuant to § 9-1-45 R.I.G.L..
The parties shall prepare the appropriate Judgment for entry by the Court within ten (10) days.